# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,<br><br>      Plaintiff,<br><br>vs.<br><br>PUBLIX SUPER MARKETS, INC.<br><br>      Defendant. | Case No.  1:23-cv-00606<br><br>**COMPLAINT AND JURY TRIAL DEMANDED** |

2769268.1

Plaintiff, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ("Nashville," "Davidson County," "County" or "Plaintiff"), brings this lawsuit against prescription opioid distributor and retailer, Publix Super Markets, Inc. ("Publix"), to recover taxpayer money and resources spent to combat the opioid epidemic wreaking havoc on the Nashville community. Nashville is the center of the music and healthcare industries. Like many other cities and counties in Tennessee and across the nation, though, Nashville is battling an opioid crisis whose hallmarks are addiction and death.

Defendant in this lawsuit contributed to the epidemic. Defendant also conspired to distribute and dispense substantial number of doses of highly addictive opioids, knowing that they were being trafficked and used for illicit purposes, and recklessly disregarded their devastating effect on the taxpayers and government of Nashville. As a result of the conspiracy, Nashville taxpayers have spent tens of millions of dollars and countless resources to fight the opioid crisis and deal with its effects on their community.

Accordingly, to protect the families of Nashville and to recover lost resources, Nashville brings this Complaint against Defendant Publix for its improper conduct. Based upon personal knowledge, information, belief, and investigation of counsel, Nashville specifically alleges:

<u>**INTRODUCTION**</u>

1.      Opioids are estimated to kill upwards of 100 Americans per day, and cost health services providers billions of dollars per year both in payments for unnecessary and harmful prescriptions of the drugs themselves and the costs of treating the diseases and injuries they cause.

2.      Accidental drug overdose deaths, of which at least two-thirds are opioid-related overdoses, are the leading cause of death for Americans under the age of 50.

2769268.1

3. Accidental drug overdose deaths, predominantly from opioids, exceed the number of deaths caused by car wrecks or guns.

4. The economic burden caused by opioid abuse in the United States is approximately $78.5[1] billion, including lost productivity and increased social services, health insurance costs, increased criminal justice presence and strain on judicial resources, and substance abuse treatment and rehabilitation.

5. Opioid distributing and dispensing companies systematically and repeatedly disregarded the safety of their customers and the public. Charged by law to monitor and report dangerous behavior, they failed to do so in favor of maximizing corporate profits and increasing their market share.

6. Corporate greed and callous indifference to known, serious potential for human suffering have caused this public health crisis. Defendant helped unleash a healthcare crisis that has had far-reaching financial, social, and deadly consequences in this country.

7. For too long, the public at large has been forced to contend with the deadly aftermath of the proliferation of opioids in society. Those responsible should be required to internalize the costs with which they have burdened society.

8. Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy

---

[1] *CDC Foundation's New Business Pulse Focuses on Opioid Overdose Epidemic*, Centers for Disease Control and Prevention (Mar. 15, 2017), https://www.cdc.gov/media/releases/2017/a0315-business-pulse-opioids.html.

2769268.1

marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[2]

9. This epidemic has resulted in a flood of prescription opioids available for illicit use or sale, and a population of patients physically and psychologically dependent on them. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

10. Defendant Publix engaged in improper conduct, including failing to implement adequate suspicious order monitoring to identify and stop shipment of suspicious orders and failing to implement adequate policies and provide tools to its pharmacists to conduct due diligence prior to dispensing opioids.

## JURISDICTION AND VENUE

11. This Court has federal subject matter jurisdiction in the constituent action based upon 28 U.S.C. § 1332, in that there is complete diversity among Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendant.

12. The Court has personal jurisdiction over Defendant because at all relevant times Defendant engaged in substantial business activities in the State of Ohio, purposefully directed their actions toward Ohio, and have the requisite minimum contacts with Ohio necessary to constitutionally permit the Court to exercise jurisdiction.

13. Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant transacted affairs and conducted activity that gives rise to the claim of

---

[2] Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, *available at* http://turnthetiderx.org/.

2769268.1

relief in this District. Moreover, this Court has been overseeing the centralized opioids litigation *In re* National Prescription Opiate Litigation, MDL 2804. In the alternative, venue would be appropriate in the Middle District of Tennessee, where Plaintiff Nashville is located, where a substantial part of the events or omissions giving rise to the claim occurred, and where a substantial part of property that is the subject of this action is situated.

14.     Should the Court find that it does not have personal jurisdiction over Defendant or that venue is not appropriate in this District, Plaintiff requests that the matter be transferred to the Middle District of Tennessee pursuant to 28 U.S.C sec. 1404.

## PARTIES

### A.     Nashville

15.     Nashville, Tennessee, is the capital and most populous city of Tennessee. It is a consolidated city municipality within Davidson County, which includes six smaller municipalities. Nashville's population is roughly 700,000 people, according to 2015 U.S. Census Bureau statistics. However, the Nashville metropolitan area, which includes Nashville and several surrounding counties include a population of roughly 1.8 million people.

16.     John Cooper is the duly elected Mayor and executive of Nashville, which is governed by a Mayor and a City Council consisting of 40 members.

17.     Nashville has the authority under the laws of the State of Tennessee to bring this lawsuit.

18.     Nashville is at the center of a rising opioid epidemic in the United States.

19.     The slide below sets forth some of the national costs of the opioid epidemic in the United States, including nearly $80 billion in costs nationally in 2015; 12.5 million people misusing prescription opioids and more than 33,000 deaths from overdoses on opioids in 2015 alone.  The number of deaths due to opioids has increased each year thereafter.





20. The number of deaths have continued to increase at an alarming rate in recent years as the slide below sets forth:





2769268.1

21.     Tennessee has the third highest levels of prescriptions for opioids in the United States.  While prescriptions are slightly declining, adverse health outcomes such as overdoses and Neonatal Abstinence Syndrome ("NAS") and mortality rates are not declining.

22.     There were 1,631 overdose deaths in Tennessee in 2016:



23.     The number of deaths from opioid and heroin overdoses in Nashville has increased dramatically in recent years as the chart below shows:



## Overdose Deaths in Davidson County, 2011 - 2016



Around 70% of all overdoses in Davidson County involve at least one opioid
2016: 84 homicides;

24. In 2016, around 70 percent of all overdoses in Nashville involved at least one opioid and 84 homicides involved opioids.

25. Nashville has created a working group to address and stem the increasing opioid epidemic through, among other responses: tracking the problem; educating the public and instituting prevention programs; helping families living with addition issues; treating addiction; and developing a city-wide response to the epidemic.

26. Nashville has incurred staggering costs and a loss of resources attempting to curb the epidemic, impacting virtually every branch of city departments from emergency services to the courts to care facilities, clinics, prisons and the police department.

27. Nashville emergency services track where the most frequent opioid emergency overdose transport calls occur as shown in one slide below:

2769268.1



**Emergency Transports for Suspect Overdose by Zip Code, 2016**

2016 Incident Zipcodes Where Overdose Was Primary Impression

Most impacted Zip Codes: 37013, 37115, 37207, and 37211

28. The slide below shows which hospitals then treat the overdose cases:



**Overdose EMS Runs by Hospital**

Vanderbilt Hospital ED 207

Midtown-St Thomas Hospital 320

West-St. Thomas Hospital 199

Summit Hospital ED 290

Centennial Hospital ED 271

Children's Hospital at

Skyline Hospital ED 718

Southern Hills Hospital ED 504

General Hospital ED 303

*Metro **PublicHealth** Dept*
Nashville/Davidson County
Protecting, Improving, and Sustaining Health

2769268.1

29.     According to the Centers for Disease Controls, in 2016 there were 85 prescriptions per every 100 person.  In years priors, that number was, at times, over 100 prescriptions per 100 persons.

30.     Nashville estimates that more than 200 deaths in 2017 in the county were due to overdoses, many of which were opioid-related.

31.     Nashville has been harmed by being required to spend increasing amounts of money and resources to combat the increasing opioid epidemic over the past decade, including but not limited to:

a.     Medication costs for employees and retirees;

b.     Health insurance premiums paid on behalf of employees and retirees;

c.     Addiction treatment for employees and retirees;

d.     Costs related to absenteeism due to addiction in the workforce;

e.     Overdose- and addiction-related medical and hospital costs for employees and retirees;

f.      Overdose-related emergency room services for indigent members of the community and jail inmates;

g.     Detoxification, substance abuse treatment, and certain related medical care for jail inmates;

h.     Incarceration costs for opioid-related crimes;

i.     Emergency ambulance, fire, and police services associated with opioid arrests and overdose calls;

j.     Drug court and related judicial expenditures;

2769268.1

k. Medical examiner and burial costs associated with overdoses and related medical conditions; and

l. Homelessness services and mental health services related to opioid addiction.

32. Nashville has expended taxpayers' resources to deal with each of the aforementioned situations caused by the opioid epidemic, as well as many others.

## B. Defendant Publix

33. Defendant Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida. Publix, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. Publix also operates retail stores, including in and around Plaintiff's geographic area, that sell prescription medicines, including opioids.

34. At all times relevant to this Complaint, Publix distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in and around Nashville, Tennessee.

35. Publix operates approximately 1,264 supermarkets across Florida, Georgia, Alabama, North and South Carolina, Tennessee, and Virginia. Most, if not all of Publix supermarkets include a pharmacy.

36. As of 2014, Publix operated 929 pharmacies in the southeastern United States, with sales exceeding $2.2 billion annually.

37. In both its capacity as a distributor and as a dispenser of controlled substances, Publix failed to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community.

2769268.1

38. During the time period relevant to Plaintiff's claims, Publix acted as both a distributor of controlled substances to its own pharmacies and a retailer dispensing controlled substances. Publix warehoused and self-distributed controlled substances to its stores, including opioids, from a warehouse devoted to pharmacy products in Orlando, Florida ("Orlando Warehouse").

### C. Defendant's Agents

39. All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendant's officers, agents, employees, or other representatives while actively engaged in the management of Defendant's affairs within the course and scope of their duties and employment, and/or with Defendant's actual, apparent, and/or ostensible authority.

## BACKGROUND

### A. The History of Opioids and Addiction

40. The synthetic opioids manufactured and distributed by Defendant are related to the opium poppy, whose pain-relieving properties and dangerous qualities have been recognized for millennia.

41. The opium poppy was a well-known symbol of the Roman Civilization, which signified both sleep and death. The Romans used opium not only as a medicine but also as a poison.[3]

42. During the Civil War, opioids, then known as "tinctures of laudanum," gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain on

---

[3] Martin Booth, Opium: A History, 20 (Simon & Schuster Ltd. 1996).

the battlefield. They were also used in a wide variety of commercial products ranging from pain elixirs to cough suppressants to beverages.

43.     By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to avoid patients' withdrawal. Both the numbers of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.[4]

44.     Due to concerns about their addictive properties, opioids have been regulated at the federal level as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioids carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

45.     Studies and articles from the 1970s and 1980s also made clear the reasons to avoid opioids. Scientists observed negative outcomes from long-term opioid therapy in pain management programs; opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, or even prohibited, the use of opioid therapy for chronic pain.

46.     Opioids include brand-name drugs and generics like oxycodone and hydrocodone. They are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous and therefore are regulated by the United States Food and Drug Administration ("FDA") as controlled substances.

---

[4] Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, Treatment Improvement Protocol, No. 43 (2005).

47. Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety.

48. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription, which may not be refilled, from a doctor and filled by a pharmacist who both must be licensed by their state and registered with the DEA. 21 U.S.C. § 829.

49. Opioids provide effective treatment for short-term post-surgical and trauma-related pain, and for palliative end-of-life care. They are approved by the FDA for use in the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Defendant, however, has manufactured, promoted, and marketed opioids for the management of pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

50. The synthetic opioid fentanyl has been a driving force behind the nation's opioid epidemic, killing tens of thousands of Americans in overdoses. Two states are now pushing to use the drug's powerful properties to execute prisoners on death row.[5]

---

[5] William Wan & Mark Berman, *States to try new ways of executing prisoners. Their latest idea? Opioids.*, Wash. Post (Dec. 9, 2017), https://www.washingtonpost.com/national/health-science/states-choose-new-ways-to-execute-prisoners-their-latest-idea-opioids/2017/12/09/3eb9bafa-d539-11e7-95bf-df7c19270879_story.html?utm_term=.c37d8e3e76b3

51.     In a November 2016 report, the DEA declared opioid prescription drugs, heroin, and fentanyl as the most significant drug-related threats to the United States.[6]

52.     The CDC estimates that approximately three out of four new heroin addicts in the United States started by abusing prescription opioids.[7]

53.     According to the CDC, opioids are responsible for the majority of drug overdoses today.[8] Additionally, opioid overdoses have quadrupled nationally since 1999.[9]

54.     The youngest members of society have also been affected by the opioid crisis. Eighty-seven children died of opioid intoxication in 2015, according to the Centers for Disease Control and Prevention, up from just 16 in 1999. Toddlers and young children are increasingly being found unconscious or dead after consuming an adult's drugs, and there has been a surge of opioid-dependent newborns.

55.     Addiction is a spectrum of substance use disorders that range from misuse and abuse of drugs to addiction. Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders.[10] Individuals suffer negative consequences wherever they fall on the substance use disorder continuum.

---

[6] Rudd et al., Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010-2015, 65 Morbidity & Mortality Wkly. Rep. 1445, 1450  (2016).

[7] Heroin Overdose Data, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/heroin.html

[8] *Id*.

[9] Drug Overdose Death Data, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/statedeaths.html. Drug deaths take a long time to certify, so this is the most recent available data. https://www.cdc.gov/nchs/data/vsrr/report001.pdf

[10] Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

2769268.1

### B.  Opioid Crisis Today

56.  The epic scale of the crisis ravaging the country has gotten too big to ignore. What was once considered a problem only amongst the rural poor now touches every demographic group – including those with historically low rates of drug use.

57.  The opioid epidemic is America's deadliest overdose crisis ever. The most recent CDC data, from 2015, show the opioid death toll exceeded 33,000 that year.

58.  By comparison, more than 58,000 US soldiers died in the entire Vietnam War, nearly 55,000 Americans died of car crashes at the peak of such deaths in 1972, more than 43,000 died due to HIV/AIDS during that epidemic's peak in 1995, and nearly 40,000 died of guns during the peak of firearm deaths in 1993.[11]

59.  Nevertheless, opioid sales overall totaled $8.6 billion and continue to rise, according to data from Quintiles IMS Holdings Inc.[12]

### TOLLING AND FRAUDULENT CONCEALMENT

60.  Plaintiff continues to suffer harm from the unlawful actions by the Defendant.

61.  The continued tortious and unlawful conduct by Defendant causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendant has not ceased. The public nuisance remains unabated.

---

[11] German Lopez, Drug overdose deaths skyrocketed in 2016, Vox (Sept. 5, 2017 12:10 P.M.), https://www.vox.com/policy-and-politics/2017/9/5/16255040/opioid-epidemic-overdose-death-2016.

[12] Esme Deprez and Paul Barrett, *The Lawyer Who Beat Big Tobacco Takes On the Opioid Industry*, Bloomberg (Oct. 5, 2017), https://www.bloomberg.com/news/features/2017-10-05/the-lawyer-who-beat-big-tobacco-takes-on-the-opioid-industry

2769268.1

62. Defendant is equitably estopped from relying upon a statute of limitations defense because it undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including public officials in Tennessee and Nashville, that it was undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status and to continue generating profits. The Defendant affirmatively assured the public, including Nashville, that it is working to curb the opioid epidemic.

63. Defendant not only has acknowledged that it understood its obligations under the law, but it further publicly affirmed its claim that its conduct was in compliance with those obligations.

64. Defendant has also concealed and prevented discovery of information, including data from the ARCOS database, which would confirm the extent of its wrongful and illegal activities.

65. Defendant distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. Defendant promoted the term "pseudoaddiction" to an unsuspecting medical community. Defendant provided the medical community with false and misleading information about ineffectual medical strategies to avoid or control opioid addiction.

66. Nashville reasonably relied on Defendant's affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

67. Nashville's claims are equitably tolled because Defendant knowingly and fraudulently concealed the facts and their wrongful acts, and the material information pertinent to their discovery, which Defendant concealed them from the Plaintiff. The Plaintiff did not know,

2769268.1

or could not have known through the exercise of reasonable diligence, of its claims, as a result of Defendant's conduct.

68. The purposes of the statutes of limitations period are satisfied because Defendant cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendant knowingly concealed.

69. In light of their statements to the media, in legal filings, and settlements, Defendant had actual and constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

70. Defendant continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendant and their agents knew or could have known about Defendant's unlawful actions because Defendant made deliberate efforts to conceal their conduct. As a result of the above, Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on their part.

## DEFENDANT PUBLIX'S CONDUCT

### A. Publix Failed to Maintain Effective Controls Against Diversion at the Wholesale Level.

71. Publix failed to implement an effective suspicious order monitoring program.

72. Publix distributed and continues to distribute controlled substances to its own Publix stores. Publix distributed to Nashville through its Orlando Warehouse, a DEA registrant. As of 2012, the Orlando Warehouse shipped to all Publix pharmacies two to three times per week.

73. Publix supplemented its own self-distribution of opioids with distribution by industry players, including McKesson and AmerisourceBergen. Even if Publix's distribution

center reduced an order to a smaller number of bottles, nothing prevented a Publix pharmacy from making up the difference by ordering opioids from third party distributors, such as McKesson and AmerisourceBergen. Not only could Publix pharmacies place another order with these outside vendors to make up the difference, but they could have orders fulfilled by both Publix and a third- party distributor at the same time.

74. Ultimately, Publix's distribution system made it nearly impossible for any order to be identified, much less reported, as suspicious. Publix placed orders of controlled substances from manufacturers and distributors who prioritized sales goals over suspicious order monitoring duties. Publix also gave significant latitude to its employees to manipulate order size and thresholds. As a result of the company's policies and procedures, Publix did not—and indeed, could not—identify what was unusual.

75. In 2015, a Teva employee, Joe Tomkiewicz, identified a potentially suspicious order by Publix through Anda, Inc., which was then one of Teva's wholesaler customers. Tomkiewicz identified "serious red flags" with regard to the Publix order.

76. Tomkiewicz was ultimately pressured by Teva's Director of National Accounts, Jocelyn Baker, to overlook the "serious red flags" in Publix's order and permit the order to process.

77. Ms. Baker highlighted Publix's importance as customer as the reason, "Publix is an established customer who sells some of our other control[led substances]," and "[t]his was not presented to them in advance and may put this award at risk."

78. Distributor McKesson provided Publix with notification of stores hitting McKesson's thresholds and regularly granted threshold increases without conducting any due diligence.

2769268.1

79. For example, in 2009, McKesson alerted Publix employees Chris Hewell, Paul Hines, and Ivonne Leon, that several of its accounts were over 80% of their authorized threshold, with "[s]everal stores already at 100%." Publix employee Chris Hewell, Manager of Procurement, responded, requesting "amnesty" from the ordering threshold program, thus permitting Publix to exceed the standard 80% threshold for ordering Oxycodone. While Ms. Martindale's initial internal response was, "I'm pretty sure this isn't something we can do," McKesson ultimately granted Publix a temporary 2000 dosage unit increase "across the board."

80. Publix allowed its individual stores to order from third party distributors without any restrictions or limited restrictions, and upon information and belief, did not sufficiently take those orders into account in Publix's self-distribution SOM system, negating any constraints from Publix's internal controls.

81. For example, in 2013, Lucy Bard, National Account Manager at Purdue, reported to her superiors at Purdue that after calling on several Publix pharmacies in St. Petersburg, Florida, "[n]ot one pharmacist has experience a push back with ordering OxyContin or maximizing their quantities per McKesson/DEA regulations."

**B. Publix Failed to Maintain Effective Controls Against Diversion in Plaintiff's Geographic Area.**

82. Publix violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

83. As a vertically integrated distributor and dispenser of prescription opioids, Publix knew or should have known that an excessive volume of pills was being sold into Plaintiff's

geographic area and ultimately, onto its streets. Publix's activities as a distributor and dispenser of opioids are inextricably linked.

84. Publix funneled far more opioids into Plaintiff's geographic area, and out of its pharmacy doors, than could have been expected to serve legitimate medical use, and ignored other indicia of diversion, including but not limited to suspicious orders.

85. Publix was aware of the suspicious orders that flowed from its distribution facilities into its own stores. Publix refused to identify, investigate, and report suspicious orders even though Publix knew, or should have been fully aware, that opioids it distributed and sold were likely to be diverted. Conversely, Publix failed to report suspicious orders, failed to meaningfully investigate, or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Plaintiff's geographic area.

86. Upon information and belief, Publix failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

87. Publix was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted. Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

88. Given Publix's retail pharmacy operations, in addition to its role as a wholesale distributor, Publix knew, or reasonably should have known, about the disproportionate flow of opioids into Plaintiff's geographic area and the operation of "pill mills" that generated opioid

prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

89. In addition, and upon information and belief, Publix knew, or deliberately turned a blind eye to, its pharmacies' role in diversion of dangerous drugs. At the pharmacy level, discovery will reveal that Publix knew, or should have known, that its pharmacies in Plaintiff's geographic area and surrounding areas, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Publix had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

90. Failures regarding dispensing in Publix's Florida stores also allowed diverted opioids to be funneled into surrounding states and demonstrated the failures of Publix systems.

91. Because of its vertically integrated structure, Publix has access to complete information regarding red flags of diversion across its pharmacies in and around Plaintiff's geographic area, but Publix chose not to utilize this information and failed to effectively prevent diversion.

## C. **Publix Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores.**

92. At all times relevant herein, Publix pharmacies sold controlled substances, including FDA Schedule II and FDA Schedule III controlled substances otherwise known as opiate narcotics or opioids.

93. "Publix Supermarkets, Inc.," not any individual Publix store, is the DEA registrant for each of Publix's pharmacies across the country.

94. As described above, Publix pharmacies ordered and were supplied opioids from a combination of outside vendors and Publix's own Orlando Warehouse.

95. Upon information and belief, Publix lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion.

96. Publix's conduct and the volume it dispensed in Plaintiff's geographic area thereafter indicates that, to the extent any policies existed, those policies were not consistently and reliably applied. In addition, as discussed further below, Publix pressured pharmacists to put profits ahead of safety.

97. Upon information and belief, Publix failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion.

## D. **Publix Failed to Guard Against Diversion in Dispensing to Plaintiff's Geographic Area.**

98. Upon information and belief, Publix pharmacies routinely have dispensed opioids in violation of the Controlled Substances Act and accompanying regulations. Such conduct was a result of Publix's lack of robust policies and procedures regarding dispensing controlled substances as well as Publix's focus on profitability over its legal obligations and public safety.

2769268.1

99.     As a sophisticated chain pharmacy, Publix had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Publix to observe patterns or instances of dispensing that are potentially suspicious of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.[13]

100.    Publix did not use data available to it to effectively comply with its legal obligations to prevent diversion and ensure only legal prescriptions were being filled at its pharmacies.

101.    Upon information and belief, Publix provided its pharmacists no or limited visibility into the data it collected, thereby depriving them of an invaluable resource when evaluating prescriptions.

102.    Publix did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, and suspicious patients.

103.    To the extent Publix did provide its pharmacists with any visibility into the data it collected, Publix deprived its pharmacists of the ability to meaningfully review and apply this data by making such significant demands on its pharmacists that it effectively prevented them from properly evaluating potential red flags, suspicious prescribers, and suspicious patients.

104.    For example, a current job posting for a "Pharmacist – 30-hour Floater" in a Marietta, Georgia Publix store lists an overwhelming list of skills needed for an applicant:

105.    The laundry list of responsibilities included in the "Pharmacist – 30-hour Floater" posting repeatedly highlights a pharmacist's role in pharmacy success, maximizing sales,

---

[13] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

2769268.1

meeting customers' needs, and gaining customer loyalty, still, the responsibilities list makes no mention of a pharmacist's role in identifying and evaluating potential red flags, suspicious prescribers, and suspicious patients.

106. In addition, Publix placed strict emphasis on its pharmacists filling prescriptions as quickly as possible while Publix simultaneously limited resources available to assist pharmacists.

107. While the above job description details that the pharmacist must inspire staff and teamwork, in reality, many Publix pharmacists lament publicly that Publix pharmacists often work without the aid of a pharmacy technician or other staff. When pharmacy technicians are unavailable or pulled away to other areas in the supermarket, Publix pharmacists are forced to work alone, and to act as both pharmacist and technician. This lack of resources or aid impairs a pharmacist's ability to address patient safety and patient care, including his or her ability evaluate potential red flags, suspicious prescribers, and suspicious patients.

108. The problem of illegal dispensing caused by Publix's focus on quickly filling prescriptions and increasing the number of prescriptions dispensed was exacerbated by Publix's inadequate pharmacy staffing. This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.

109. In addition, the job posting for "Pharmacist – 30-hour Floater" position states the position is eligible for a "Retail bonus" benefit which is paid quarterly and is "based on sales and profits that are calculated at the end of each inventory period."

110. Publix's compensation structure presents a conflict of interest for pharmacists on at least one front as it incentivizes pharmacists to fill as many prescriptions as possible to increase the store profit metric. In this structure, a pharmacist would necessarily receive a higher

bonus for filling illegitimate prescriptions (by increasing store profits). On the other hand, rejecting illegitimate prescriptions would decrease overall sales and profits, and decrease the final bonus amount a pharmacist could receive.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**COMMON LAW PUBLIC NUISANCE**
**(Tennessee Common Law)**

111.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

112.    Under Tennessee common law, a "public nuisance" is defined as any "condition of things which is prejudicial to health, comfort, safety, property, sense of decency or morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law." *State ex. rel. Swann v. Pack*, 527 S.W.2d 99, 113 (Tenn. 1975).

113.    A common law nuisance "extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable or comfortable use of property." *Id.*

114.    The public nuisance complained of herein includes the over-saturation, unlawful availability, and abuse of opioids in Nashville for non-medical purposes, as well as the adverse social and environmental outcomes associated with widespread illegal opioid use.

115.    Defendant distributed and dispensed prescription opioids without due diligence in a manner that created, or participated in creating, a public nuisance that is harmful and injurious to Nashville and its residents.

116.    The nuisance includes the over-saturation, unlawful availability, and abuse of opioids as well as the adverse social and environmental outcomes associated with widespread illegal opioid use.

117.   Defendant knew or should have known that its distribution and dispensing of opioids would create a public nuisance.

118.   Defendant's actions created and expanded the market for opioids.

119.   Defendant's actions were a substantial factor in opioids becoming widely available and widely used. Without the Defendant's actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted, including in Nashville.

120.   Defendant's nuisance-causing activities include dispensing, and/or facilitating the illegal sale of, prescription opioids from premises in and around Nashville to unintended users in the community, including people at risk of overdose and criminals.

121.   Defendant's nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and their failure to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

122.   Defendant knowingly, intentionally, recklessly, and/or negligently disseminated massive quantities of prescription opioids to suspect physicians and pharmacies and into the black market, including so-called "pill mills" and other dealers.

123.   Defendant also enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including through alleged "pill mills" as well as other drug dealers, with actual knowledge, intent, and/or reckless or negligent disregard that such opioids would be illegally trafficked and abused.

124.   The public nuisance created by Defendant endangers the health and safety of the Nashville and its residents.

2769268.1

125. The public nuisance created by Defendant has caused, and continues to cause, significant harm to, and the expenditure of taxpayer dollars by Nashville, including, but not limited to the following:

a. The staggering rates of opioid use among adults in Nashville has led to unnecessary opioid abuse, addiction, injuries, overdose, and deaths. It has also resulted in increased crime and property damage in Nashville.

b. Infants have been born addicted to opioids due to pre-natal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c. Defendant's success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for illicit use and fueled a new wave of addiction, abuse, and injury. Defendant's scheme created a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

d. The diversion of opioids into the secondary, illicit market and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of Nashville.

e. Adults and children in Nashville who have never taken opioids have also suffered the costs of the Defendant's public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids. All these problems harm Nashville by diminishing Nashville's revenues and forcing it to make increased expenditures.

2769268.1

126. Nashville public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resource which could be used to benefit the public at large in Nashville.

127. Defendant's nuisance-causing activities are not outweighed by the utility of Defendant's behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in the Defendant's failing to identify, halt, and report suspicious opioid transactions, including distributing and dispensing without due diligence.

128. At all times, Defendant possessed the right and ability to control the nuisance-causing outflow of prescription opioids to pharmacy locations and other points of sale into the surrounding Nashville. Defendant had the power to shut off the supply of illicit opioids into the County. Defendant had the power to stop providing false information to the market about the dangers of opioids and the highly addictive nature of their opioid products

129. As a direct and proximate result of the public nuisance, Nashville has sustained harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendant's nuisance-causing activity, including, but not limited to, costs of hospital services, healthcare, child services, judicial services, incarceration, medical examinations, burials, and law enforcement.

130. Defendant should be required to pay the expenses the Nashville has incurred or will incur in the future to fully abate the nuisance.

**SECOND CLAIM FOR RELIEF**
**STATUTORY PUBLIC NUISANCE**
**(Tenn. Code Ann. § 29-3-101, *et seq.*)**

131. Plaintiff incorporates all preceding and subsequent paragraphs by reference.

132. Under Tennessee statutory law, "[a]ny person who uses, occupies, establishes or conducts a nuisance, or aids or abets therein, and the owner, agent or lessee of any interest in any

such nuisance, together with the persons employed in or in control of any such nuisance by any such owner, agent or lessee, is guilty of maintaining a nuisance and such nuisance shall be abated as provided hereinafter." Tenn. Code Ann. § 29-3-101(b).

133. The term "nuisance" includes "[a]ny place in or upon which. . . [the] unlawful sale of any regulated legend chug, narcotic or other controlled substance . . . are carried on or permitted, and personal property, contents, furniture, fixtures, equipment and stock used in or in connection with the conducting and maintaining any such place for any such purposes." *Id.* § 29-3-101 (a)(2)(A).

134. The nuisance statute further provides that, in an "order of abatement, the court may . . . assess costs of public services required to abate or manage the nuisance, including, but not limited to, law enforcement costs, if any, caused by the public nuisance." *Id.* § 29-3-110.

135. Defendant distributed and dispensed prescription opioids without due diligence in a manner that created, or participated in creating, a public nuisance that is harmful and injurious to Nashville and their residents.

136. The public nuisance complained of herein includes the over-saturation, unlawful availability, and abuse of opioids in Nashville for non-medical purposes, as well as the adverse social and environmental outcomes associated with widespread illegal opioid use.

137. Defendant knew or should have known that their failure to identify and stop shipment of suspicious orders and failure to conduct due diligence prior to dispensing opioids would create a public nuisance. Nevertheless:

a. Defendant engaged in distribution without identifying and stopping shipment of suspicious orders.

b.      Defendant dispensed opioids without due diligence for use by the residents of Nashville.

c.      Defendant's actions created and expanded the market for opioids, promoting its wide use for pain management.

138.    Defendant's actions were a substantial factor in opioids becoming widely available and widely used. Without the Defendant's actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

139.    Defendant's nuisance-causing activities include distributing, dispensing, and/or facilitating the illegal sale of, prescription opioids from premises in and around Nashville to unintended users in Nashville, including people at risk of overdose and criminals.

140.    Defendant's nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and their failure to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

141.    Defendant knowingly, intentionally, recklessly, and/or negligently disseminated massive quantities of prescription opioids to suspect physicians and pharmacies and into the black market, including so-called "pill mills" and other dealers.

142.    Defendant also enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" and other drug dealers, with actual knowledge, intent, and/or reckless or negligent disregard that such opioids would be illegally trafficked and abused.

143. The public nuisance created by Defendant endangers the health and safety of Nashville and its residents.

144. The public nuisance created by Defendant has caused, and continues to cause, significant harm and taxpayer dollars to Nashville including, but not limited to the following:

a. The staggering rates of opioid use among adults in Nashville has led to unnecessary opioid abuse, addiction, injuries, overdose, and deaths. It has also resulted in increased crime and property damage in Nashville.

b. Infants have been born addicted to opioids due to pre-natal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c. Defendant's success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendant's scheme created a new secondary market for opioids - providing both the supply of narcotics to sell and the demand of addicts to buy them.

d. The diversion of opioids into the secondary, illicit market and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of Nashville.

e. Adults and children in Nashville who have never taken opioids have also suffered the costs of the Defendant's public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become

2769268.1

addicted to, overdosed on, or been killed by opioids.  All these problems harm Nashville by leading to decreased revenues for Nashville and increased expenditures.

145.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in Nashville.  Defendant's nuisance-causing activities are not outweighed by the utility of Defendant's behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in the Defendant's failing to identify, halt, and report suspicious opioid transactions and dispensing without due diligence. Moreover, there is no legitimate societal interest to the diversion and/or illegal sale of prescription opioids.

146.    At all times, Defendant possessed the right and ability to control the nuisance-causing outflow of prescription opioids to pharmacy locations and other points of sale into the surrounding Nashville. Defendant had the power to shut off the supply of illicit opioids into Nashville. Defendant had the power to stop providing false information to the market about the dangers of opioids and the highly addictive nature of their opioid products.

147.    As a direct and proximate result of the public nuisance, Nashville has sustained harms by spending a substantial amount of money trying to fix the societal harms caused by the Defendant's nuisance-causing activity, including, but not limited to, costs of hospital services, healthcare, child services, and law enforcement.

148.    Defendant should be required to pay the expenses Nashville has incurred or will incur in the future to fully abate the nuisance.

**THIRD CLAIM FOR RELIEF**
**TENNESSEE DRUG DEALER LIABILITY ACT**
(**Tenn. Code Ann. § 29-38-101** *et seq)*

149.    Plaintiff incorporates all preceding paragraphs by reference.

2769268.1

150. Tennessee's DDLA, Tenn. Code Ann. § 29-38-101 *et seq.,* provides a civil remedy for "damages to persons in a community as a result of illegal drug use." Tenn. Code Ann. § 29-38-102.

151. Among the persons to whom the DDLA provides a remedy are "[a] … *governmental entity*, … or other entity that funds a drug treatment program or employee assistance program for the individual drug user, or that otherwise expended money on behalf of the individual drug user." Tenn. Code Ann. § 29-38-106 (emphasis added).

152. One of the intents of the DDLA, among others, is "to shift, to the extent possible, the cost of damage cause by the existence of the illegal drug market in a community to those who illegally profit from that market." Tenn. Code Ann. § 29-38-102.

153. Plaintiff is a governmental entity that funds drug treatment and assistance programs for individual drug users in the Nashville, and otherwise expended significant sums of money as a result of the illegal distribution of opioids in Nashville.

154. The DDLA makes anyone who "knowingly participates in the illegal drug market within this state ... liable for civil damages." Tenn. Code Ann. § 29-38-105(a).

155. "A person may recover damages under [the DDLA] ... for injury resulting from an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-105(b).

156. Under Tennessee criminal laws, such as Tenn. Code Ann § 39-17-417 and Tenn. Code Ann § 39-17-418, hydrocodone, oxycodone, oxymorphone, Roxicodone, OxyContin, Opana, Lortab and other opioids are illegal drugs if possessed, sold, and distributed without a valid prescription.

157. The DDLA imposes liability on those who directly participate in the distribution of an illegal drug that causes damages. Damages may be recovered under the DDLA from a

2769268.1

"person who knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by the individual drug user." Tenn. Code Ann. § 29-38-106(5)(b)(l ).

158.    The DDLA also imposes market liability on those who participate in the unlawful distribution of drugs in the area where illegal drugs cause damages. Damages may be recovered under the DDLA from a "person who knowingly participated in the illegal drug market, if (A) [t]he place of illegal drug activity by the individual drug user is within the illegal drug market target community of the defendant; (B) the defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user; and (C) [t]he defendant participated in the illegal drug market at any time during the individual user's period of illegal drug use." Tenn. Code Ann. § 29-38-106(5)(b)(2)(A)-(C).

159.    For purposes of the DDLA, an "'individual drug user' means the individual whose illegal drug use is the basis of an action brought under [that statute]," Tenn. Code Ann. § 29-38-104(4).

160.    Residents of Nashville who acquired hydrocodone, oxycodone, oxymorphone, Roxicodone, OxyContin, and/or Opana from unlicensed drug dealers illegally distributing the prescription opioids in Nashville are "individual drug user[s]" under the DDLA.

161.    Those purchases of hydrocodone, oxycodone, oxymorphone, OxyContin, Roxicodone and/or Opana were illegal in that they were made without a valid prescription as required by Tenn. Code Ann. § 53-l l-308(a).

162.    Defendant knowingly participated in the distribution and dispensing of prescription opioids that reached Nashville during all times relevant to this complaint. For purposes of the DDLA, Defendant's "illegal drug market target community" is the entire state of

Tennessee, because Defendant participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug." Tenn. Code Ann §§ 29-38- 104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that Defendant far exceeded the four-ounce level.

163.    Defendant knowingly failed to implement effective controls and procedures in their supply chains to guard against theft, diversion, and abuse of prescription opioids, and failed to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

164.    As a result, Defendant knowingly disseminated massive quantities of prescription opioids for distribution to Nashville, including "pill mills," and other drug dealers.

165.    Defendant also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" as well as and other drug dealers, knowing that such opioids would be illegally trafficked and abused.

166.    The diversion of prescription opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has place unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of Nashville.

167.    Having knowingly participated in the illegal distribution of hydrocodone, oxycodone, oxymorphone, OxyContin, Roxicodone, and/or Opana, the drugs purchased or obtained by residents of Nashville in the "place of illegal drug activity," Defendant is liable to Plaintiff Nashville under the DDLA even for damages caused by opioids in Nashville that were acquired from distribution channels in which Defendant was a market participant.

### FOURTH CLAIM FOR RELIEF
### NEGLIGENCE

168.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

169.    To prevail on a negligence claim, a plaintiff must establish (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 771 (Tenn. 2006).

170.    Defendant had an obligation and duty to exercise reasonable care in the distribution and dispensing of highly dangerous opioid drugs in and around Nashville.

171.    Defendant owed a duty to Nashville, and to the public health and safety in Nashville, because the injuries and harms to the county were foreseeable, and in fact were foreseen by Defendant.

172.    Defendant breached this duty by failing to take any action to prevent or reduce the improper distribution and dispensing without due diligence of the opioid drugs.

173.    Reasonably prudent wholesale drug distributors and dispensing would have anticipated the scourge of opioid addiction that would wreak havoc on communities, including Nashville.  The escalating amounts of addictive drugs flowing through Defendant's businesses

2769268.1

and the sheer volume of these prescription opioids, further alerted Defendant that addiction was fueling the increased consumption and that legitimate medical purposes were not being served.

174. Defendant knew or should have known that opioids were unreasonably dangerous and were likely to cause addiction.

175. As a direct and proximate result of Defendant's negligence, the County has suffered and continues to suffer injury, including but not limited to incurring excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, bearing the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for County residents and using County resources in relation to opioid use and abuse.

176. As a proximate result, Defendant and its agents have caused Nashville to incur excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, and the County has borne the massive costs of these illnesses, deaths and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for County residents and expend County resources in relation to opioid use and abuse.

177. Defendant was negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct.

178. Defendant was negligent in not disclosing to Nashville suspicious orders for opioids pursuant to the requirements of the Controlled Substances Act, as well as Tennessee State law.

179. Defendant failed to enact policies and/or give its pharmacists the tool necessary to conduct adequate due diligence prior to dispensing opioids.

180. Defendant's acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

181. Defendant is in a class of a limited number of parties that can legally distribute and dispense opioids, which places it in a position of great trust by the County.

182. The trust placed in Defendant by Nashville through the license to distribute and dispense opioids in Nashville creates a duty on behalf of Defendant to prevent diversion of the medications it supplies for illegal purposes.

183. A negligent and/or intentional violation of this trust poses distinctive and significant dangers to the County and its residents from the diversion of opioids for non-legitimate medical purposes and addiction to the same by consumers.

184. Defendant was negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

185. Defendant is required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of opioids during distribution and dispensing.

186. Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

187. Defendant acted intentionally and with actual malice and reckless disregard for Nashville and its residents and taxpayers.

188. Defendant is in exclusive control of the management of the opioids they distribute and dispense in Nashville.

2769268.1

189. Nashville is without fault and the injuries to the County and its residents would not have occurred in the ordinary course of events had Defendant used due care commensurate to the dangers involved in the manufacture and distribution of opioids.

190. Plaintiff is entitled to recover damages caused by Defendant's negligence in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

191. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

192. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendant has profited and benefited from the opioid epidemic.

193. For years, Nashville has conferred a benefit on Defendant by attempting to address all aspects of the opioid epidemic, including but not limited to, supplying emergency care and treatment to opioid users and their families; education , counseling and therapy to opioid users; police protection and law enforcement as a result of opioid users; abatement of nuisances; and other efforts to address and curb the increasing epidemic, all of which conferred a benefit on Defendant, which continued to have more customers and a market in Nashville for profiteering.

194. Nashville and its residents expected that Defendant had provided all the necessary and accurate information regarding the risks associated with opioids and had not misrepresented any material facts regarding those risks.

195. Defendant appreciated the benefits conferred upon them by Nashville.

2769268.1

196.    Defendant appreciated the profits and other benefits conferred upon them by Nashville under such circumstances that it would be inequitable for Defendant to retain the benefit without payment of the value thereof.

197.    The benefits conferred upon Defendant by Nashville were unjust.

198.    Defendant, through the wrongful conduct described above, have been unjustly enriched at the expense of Plaintiff.

199.    In equity and good conscience, it would be unjust and inequitable to permit Defendant to enrich themselves at the expense of Plaintiff and its residents.

200.    By reason of the foregoing, Defendant must disgorge their unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and provide restitution to Plaintiff.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**
**Tenn. Code Ann. § 47-18-101,** *et seq.*

201.    Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

202.    For purposes of the Tennessee Consumer Protection Act ("TCPA"), Nashville is a "consumer" and "person," as defined in Tenn. Code Ann. § 47-18-103(2) and (13), which made opioid-related purchases, including paying money for goods and services, from Defendant. Nashville has authority to bring this claim pursuant to Tenn. Code Ann. § 47-18-103(2) and (13), and § 47-18-109.

203.    In connection with the distribution and dispensing of opioids to Nashville, directly or indirectly, Defendant violated the TCPA in at least the following ways:

2769268.1

**a.** Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another in violation of Tenn. Code Ann. § 47-18-104(b)(5); and

**b.** Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another in violation of Tenn. Code Ann. § 47-18-104(b)(7);

204. Defendant's acts and/or practices caused actual harm to Nashville, including financial loss.

205. Nashville has been injured as a result of Defendant's acts and/or practices.

206. Defendant's conduct was and continues to be willful and knowing.

207. Nashville has suffered an ascertainable loss of money or property and/or other things of value as a result of the use or employment by Defendant of an unfair or deceptive act or practice described in Tenn. Code Ann.§47-18-104(b).

208. Nashville is entitled to recover its damages caused by Defendant's violation of the TCPA in an amount to be determined at trial, including treble damages if the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of the TCPA, as well as attorneys' fees.

209. Nashville also seeks injunctive relief pursuant to Tenn. Code Ann. §47-18-109.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

A. Enter judgment against Defendant in favor of Plaintiff;

B. Award damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

C. Award pre-judgment and post-judgment interest as provided by law, and award such interest at the highest legal rate;

2769268.1

D. Enter an order of abatement and permanent injunction against Defendant prohibiting it from engaging in the unlawful conduct detailed herein, including over-supply of opioids in and around Nashville;

E. Enter an order requiring Defendant to fund an "abatement fund" for the purpose of abating the opioid nuisances;

F. Award Plaintiff the costs of suit, including reasonable attorneys' fees as provided by law, including the Tennessee Consumer Protection Act;

G. Require Defendant to disgorge its unjustly acquired profits and other monetary benefits resulting from their unlawful conduct, and provide restitution to Plaintiff;

H. Award treble damages and injunctive relief pursuant to the Tennessee Consumer Protection Act; and

I. Award such further and additional relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Nashville demands a trial by jury on all issues so triable.

Dated: March 21, 2023

*/s/ Mark P. Chalos*
Mark P. Chalos (*Pro Hac Vice pending*)
Kenneth S. Byrd (*Pro Hac Vice pending*)
**LIEFF CABRASER HEIMANN &**
  **BERNSTEIN, LLP**
222 2nd Avenue South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965
Email: mchalos@lchb.com
Email: kbyrd@lchb.com

2769268.1

**LIEFF CABRASER HEIMANN &**
  **BERNSTEIN, LLP**
Elizabeth J. Cabraser (*Pro Hac Vice pending*)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008
Email: ecabraser@lchb.com

**LIEFF CABRASER HEIMANN &**
  **BERNSTEIN, LLP**
Paulina do Amaral (*Pro Hac Vice pending*)
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
Email: sfineman@lchb.com
Email: pdoamaral@lchb.com

**MANSON JOHNSON CONNER, PLLC**
Isaac T. Conner (*Pro Hac Vice pending*)
Andre P. Johnson (*Pro Hac Vice pending*)
215 2nd Ave North, Suite 300
Nashville TN 37201
Telephone: (615) 254-1600
Facsimile: (615) 891-239
Email: Iconner@mansonjohnsonlaw.com
Email: Ajohnson@mansonjohnsonlaw.com

*Attorneys for Metropolitan Government of Nashville and Davidson County, Tennessee*

2769268.1